UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 09-30001-MAP |
| | ) | |
| MICHAEL JACQUES, | ) | |
| Defendant. | ) | |

Government's Sentencing Memorandum

I.    Introduction

The United States of America, by Carmen M. Ortiz, United States Attorney for the
District of Massachusetts,  respectfully requests this Court to sentence the Defendant Michael
Jacques to 16 years in prison.[1]  This term of imprisonment - a modest upward variance from the
guideline sentencing range ("GSR") -  is justified by 18 U.S.C. § 3553 factors including the
seriousness of the offense, the need to promote justice, and to provide adequate deterrence.  The
Defendant Jacques, with Benjamin Haskell and Thomas Gleason, committed a crime of great
magnitude, a shocking reminder of the racism that exists in our communities.  It is critical for
this Court to impose a sentence that provides a just punishment commensurate with the serious
nature of the offense, promotes respect for equal rights of our citizenry, and affords strong
deterrence for those who share such racial prejudice.

II.    Legal Principles

In sentencing a defendant under the dictates of 18 U.S. C. § 3553, the "starting point" for
a district court is "the guideline range, taking applicable departures into account." United States

---

[1] The government's sentencing recommendation is detailed below in Section IV on pages
7-8.

v. Saez, 444 F.3d 15, 17 (1st Cir. 2006) citing United States v. Jimenez-Beltre, 440 F.3d 514 (1st Cir. 2006). Having established the GSR, a district court must evaluate the sentencing factors set out in 18 U.S. C. § 3553(a), "along with any other relevant considerations." United States v. Dixon, 449 F.3d 194, 204 (1st Cir. 2006). A district court must then determine "whether a sentence above, within, or below the GSR is warranted." Dixon, 449 F.3d at 204. The district court is given broad discretion in sentencing, and is reviewed for abuse of discretion. Gall v. United States, 552 U.S. 38, 45 (2007) citing United States v. Booker, 543 U.S. 220, 260-62 (2005). The First Circuit has recognized how, after a district court has calculated the GSR, "sentencing becomes a judgement call, and a variant sentence may be constructed based on a complex of factors whose interplay and precise weight cannot even be precisely described." United States v. Politano, 522 F. 3d 69, 73 (1st Cir. 2008) (quoting United States v. Martin, 520 F.3d 87, 92 (1st Cir. 2008).

III.    The Defendant's Convictions

        On April 14, 2011, a jury convicted the defendant of two hate crimes - conspiring to violate civil rights in violation of 18 U.S.C. § 241 (Count One), and causing damage to religious property because of the race of the people associated with the property in violation of 18 U.S.C. § 247(c) (Count Two) - as well as using fire to commit the felonies charged in Counts One and Two in violation of 18 U.S.C. § 844(h)(1) (Count Three). In essence, the jury found the Defendant guilty of setting fire to the Macedonia Church of God in Christ, a predominantly black church, soon after Barack Obama was elected to be the first African American President of the United States. During the trial evidence was introduced that the defendant, Benjamin Haskell, and Thomas Gleason started the fire in the early morning hours of November 5, 2008 in

2

retaliation for the election of President Obama. The jury heard that the Defendant and Benjamin Haskell had admitted their involvement in the church fire to a friend, that the Defendant had boasted about his involvement to an undercover Massachusetts State trooper, and that the Defendant had ultimately confessed that he had joined his co-defendants in the plan to burn the church motivated by racism. In addition, codefendant Thomas Gleason testified that he, Benjamin Haskell and the Defendant participated in burning down the predominantly African-American church because Barack Obama had been elected as the first African-American President of the United States.

The jury's guilty verdict for Damage to Religious Property in Violation of Title 18 United States Code Section 247(c) established beyond a reasonable doubt the defendant's racial motivation, as this specific intent is an element of the offense. During the trial, numerous witnesses attributed serious racial animus to Jacques. Specific examples of Defendant's racism include testimony concerning Defendant's regular use of the racial epithet "nigger," targeted use of the epithet "nigger" at minorities, use of of the epithet to deride President Obama, use of the racial epithet to describe his own nephew, efforts to train a dog to "get the nigger" and react with amusement as the dog followed his command to act aggressively towards African-Americans.[2] Witnesses described how racism was not a passing fancy of Jacques, instead his racism was deeply rooted to the point that it was a part of his identity.[3]

---

[2]See witness testimony of Tr. April 6 at 13-17 (Joshua Barr); 33-35 (Edwin Gonzalez-Ramirez); 44-48 (Enid Rivera-Pratts); 60-65 (Adam McNair); Tr. April 5 at 138-40 (Robert Demers) .

[3]See e.g. testimony of Sean Swider (March 22, 23, 2011)

3

IV.    Defendant's GSR

The Defendant's GSR, as calculated by U.S. Probation Officer Richard Rinaldi, is 46 months to 57 months, to be followed by 120 months.  PSR § 78.  Thus, the high end of a guideline sentence would amount to 177 months.   The government, in agreement with Mr. Rinaldi's assessment of the operating GSR,  now seeks an upward variance to 192 months imprisonment.

V.    Offenses of Conviction  - Statutory History

The statutory histories of the hate crimes for which a jury convicted Defendant are relevant to underscore the significance of Defendant's offense conduct.

A.    Conspiracy Against Rights (18 U.S.C. § 241) (Count One)

Section 241 is a Reconstruction Era statute.  It was originally passed as Section 6 of the Enforcement Act of 1870, 16 Stat. 141, 144.  The full title was "An Act to enforce the Right of Citizens of the United States to vote in the several States of this Union, and for other Purposes." See United States v. Williams, 341 U.S. 70, 73-77 (1951).

The years immediately following the Civil War were a time of near-anarchy in many states.  As the Supreme Court explained, "In 1868 a wave of murders and assaults was launched including assassinations designed to keep Negroes from the polls.  The States themselves were helpless, despite the resort by some of them to extreme measures such as making it legal to hunt down and shoot any disguised man.  Within the Congress pressures mounted in the period between the end of the war and 1870 for drastic measures."  United States v. Price, 383 U.S. 787, 804 (1966).  In 1865, Congress ratified the Thirteenth Amendment (Abolition of Slavery); in 1866, Congress enacted the Civil Rights Act, which included what is now 18 U.S.C. § 242 in a

narrower form; in 1868, Congress ratified the Fourteenth Amendment (Equal Protection); and in

1870, Congress ratified the Fifteenth Amendment (Voting Rights).  On May 31, 1870, Congress

passed what is now § 241.  It was introduced by Senator Pool of North Carolina and was

provoked by "the lawless activities of private bands, of which the Klan was the most

conspicuous."  Williams, 341 U.S. at 76.  Senator Pool eloquently stated the rationale behind the

legislation:

> The liberty of a citizen of the United States, the prerogatives, the rights, and the immunities of American citizenship, should not be and cannot be safely left to the mere caprice of States either in the passage of laws or in the withholding of that protection which any emergency may require.  If a State by omission neglects to give to every citizen within its borders a free, fair, and full exercise and enjoyment of his rights it is the duty of the United States Government to go into the State, and by its strong arm to see that he does have the full and free enjoyment of those rights.

Price, 383 U.S. at 819 (Appendix to Opinion of the Court) (Remarks of Sen. Pool on sponsoring

Sections 5, 6, and 7 of the Enforcement Act of 1870).  Justice Brennan described the

congressional response during this period as follows: "Stirred to action by the wholesale

breakdown of protection of civil rights in the South, Congress carried to completion the creation

of a comprehensive scheme of remedies–civil, criminal, and military–for the protection of

constitutional rights from all major interference."  Adickes v. S.H. Kress & Co., 398 U.S. 144,

205 (1970).

      B.     Damage to Religious Property (18 U.S.C. § 247(c) (Count Two)

The current form of 18 U.S.C. § 247 is the result of a 1996 Amendment to the original

1988 statute.  The original was enacted to create federal penalties for the damage or destruction

of religious property or the forcible interference with a person's exercise of religious beliefs.

See S. Rep. No. 100-324, at 1 (1988) reprinted in 1988 U.S.C.C.A.N. 721, 721.  Prior to its

enactment, there were very limited circumstances under which religiously motivated violence could be prosecuted by the federal government.  The need for a broader federal criminal statute was prompted by the "growing number of incidents of religiously motivated violence." Id. at 722.  The Amendment, titled the Church Arson Prevention Act of 1996, represented Congress's bipartisan response to a wave of church fires that swept across the United States in 1995 and 1996.  A large number of arsons were of rural churches with predominantly African-American congregations.  See, e.g., William Booth, In Church Fires, a Pattern but No Conspiracy, Washington Post, June 19, 1996, at A1 (reporting 37 suspicious fires at black churches in the past 18 months); Joint Statement of James E. Johnson, Assistant Secretary (Enforcement), Department of the Treasury, and Deval L. Patrick, Assistant Attorney General, Civil Rights Division, Department of Justice, Co-Chairs, National Church Arson Task Force, Before the S. Comm. on the Judiciary, 104th Cong., 1996 WL 353903 (noting that "federal agents have responded to 145 suspicious fires or acts of desecration since January 1, 1995.  Of those, 73 were at African American churches, with the large majority of these in the Southeastern states").  Thus, there were racial as well as religious overtones to the attacks.

The conflagration was widely reported in the press and received immediate attention on Capitol Hill.  The Judiciary Committees of both the House and Senate held hearings.  Many of those who testified recalled the bloody civil rights movement of the 1960s and warned of resurgent racist violence.  As Senator Kennedy said, "We have come a long way from the era of Jim Crow, the Klan, and nightly lynchings.  But these arsons are a chilling reminder of how far we have to go as a nation in rooting out racism."  142 Cong. Rec. S6517-04 at S6520, 1996 WL 335941; Statement of Sen. Heflin, 142 Cong. Rec. S6517094 at S6526 ("As these hateful

6

incidents continue to occur with alarming regularity, we are reminded of some of the most terrible moments of the civil rights struggle of the 1960s"); Statement of Sen. Kerry, 142 Cong. Rec. S6517-04 at S6527 ("Those who have committed these hate crimes have forgotten the lessons of history."). On July 3, 1996, president Clinton signed the Church Arson Prevention Act, which had been passed unanimously by both houses of Congress.

      C.    <u>The Historical Significance of this Case</u>

As noted above, the historical fabric of the United States is interwoven with racial strife and the government's efforts to ensure equality. The emancipation of human beings who had been enslaved based on their race, was only a prelude to the subsequent century and a half struggle for racial equality in all aspects of American life, including the right to religious freedom. Our country's commitment to equality has been plagued by violent attacks, lynchings, segregation, and church burnings.

In this case, almost 150 years after the Emancipation Proclamation, on the historic date when the first African American was elected to be President of the United States, the Defendant and his co-defendants resurrected the racial hatred of America's past by burning down the Macedonia Church. This hateful and harmful act, standing alone, was an intolerable attack on the Church's African American congregation. Implicit in the grand design of this arson was the perpetuation of racism. Juxtaposed to Barack Obama's election as President, it represented a hateful attack against racial equality generally, and therefore an attack against all Americans.

VI.    <u>Government's Sentence Recommendation</u>

The government respectfully requests this Court to impose the following sentence:

      A.    <u>Conspiracy Against Rights (Count One)</u> - 72 months imprisonment; three years supervised release; $100 special assessment; restitution as set forth

in PSR ¶ 93

B.   <u>Damage to Religious Property (Count Two)</u> - 72 months imprisonment
     (concurrent with sentence imposed on <u>Count One</u>); five years supervised release;
     $100 special assessment; restitution as set forth in PSR ¶ 93

C.   <u>Use of Fire to Commit Federal Felony (Count Three)</u> - 120 months imprisonment,
     *imposed consecutively* to the 72 month sentence imposed on Counts
     One and Two; three years supervised release; $100 special assessment; restitution
     as set forth in PSR ¶ 93

The government's recommendation of a total of 192 months imprisonment represents a

modest and appropriate upward variance when considering that the Defendant's GSR does not

adequately account for the magnitude of his crimes.[4]  The aggravating factors supporting this

increase from the GSR include the egregious racial motivation and the scope of the damage

caused by the offense conduct.  <u>See</u> 18 U.S.C. § 3553(b)(1).  The nature and seriousness of this

Defendant's offense conduct exceeds what the Sentencing Commission reasonably considered

and expected when setting the offense level for what is essentially a public safety and property

damage offense guideline as set forth in Section 2K1.4(a)(2)(A).

The essence of the Defendant's crimes registers beyond the advisory GSR range when

considering the nature and degree of the defendants's racial prejudice that served as their

motivation to stigmatize such a historic event.  The Defendant refused to accept that the political

---

[4]While the GSR serves as the sentencing court's starting point, the district court should
not mechanically assume the GSR frames the boundaries of a reasonable sentence in every case.
<u>Martin</u>, 520 F.3d at 93 citing <u>Gall</u>, 128 S.Ct. at 596-597.  It is within the court's discretion to
deviate from the GSR to the extent the court identifies sound, case specific reasons as
justification.  <u>Id</u>.  <u>See Rita v. United States</u>, 558 U.S. 338, 351 (2007)(allowing a district to find
that the Guidelines sentence should not apply, perhaps because ... the case at hand falls outside
the 'heartland to which the commission intends individual Guidelines to apply, perhaps because
the Guidelines sentence itself fails properly to reflect  3553(a) considerations, or perhaps
because the case warrants a different sentence regardless).

and social will of the American citizenry had progressed in 2008 so far as to elect the country's

first African-American President.  The Defendant and his coconspirators protested by expressing

their racial hated and intolerance with far more than a symbolic act or an exercise of speech.

The Defendants's racist ideology, born of intolerance and ignorance, crystalized in their hate-

driven plot to harm an entire community by setting forth to cause massive physical and untold

psychological damage.

  This extraordinary criminal offense falls outside the assigned GSR ambit - which

prescribes a nine-month range from 48 to 57 months for the underlying hate crimes-  as the

defendants's acts constituted far more than a crime against property.  The offense conduct in this

case is more accurately characterized as a crime of violence against a people because of their

race.  Indeed, the burning of the Macedonia  church was the result of a very deliberate and

intentional series of  acts.  The Defendants's  determination to commit such a significant offense

was revealed by their actions on November 5, 2008, when early that morning they marched with

containers of gasoline from the Gleason residence through the woods to the Macedonia Church.

Once they arrived at the church site, they forced their way into the church and poured sufficient

gasoline to guarantee total destruction.

  The Defendants undoubtedly recognized the attention their crime would garner after the

historical election.  It is inescapable that this attention appealed to them and factored into their

decision to send a message that racism is alive and well in Springfield Massachusetts: that the

new President would be met with great resistance based on the color of his skin.  The timing of

this crime to coincide with the historic election renders inadequate the three-level hate-crime

victim enhancement pursuant to USSG § 3A1.1(a)),[5] and an upward variance is appropriate even when considering this enhancement. See  United States v. Walker, 2011 WL 5865652 (1st Cir.) (district court within its discretion to depart upwards based on unusual seriousness of defendant's crime even though upward adjustment had already been made based on  defendant's atypical criminal conduct).

When considering the magnitude of the Defendant's conduct, a term of imprisonment of 192 months is a reasonable sentence, a modest variance from the GSR, and well within this Court's discretion.  See United States v. Politano, 522 F.3d 69 (1st Cir. 2008) (court of appeals upheld sentencing judge's decision to impose an upward variance from 6 to 12 month GSR to a sentence of 24 months as supported by crime's affect on community and need for deterrence); United States v. Richart, 2011 WL 6090119 (8th Cir.) (circumstances of offense were not typical, but were particularly egregious, justifying upward variance from GSR of zero months to six months to sentence of consecutive 60 month sentences); United States v. Talk, 2011 WL 6145337 (10th Cir.) (court upheld sentencing court's variance based on insufficiency of GSR for offense conduct).

In Politano, the district court recognized the impact the offense conduct had in that particular community, as well as the need for a sentence that deterred future unlawful sales of firearms in sentencing Politano to a term above the GSR.  Politano, 522 F.3d at 72-73.  The First Circuit upheld the upward variance as being reasonably based on 3553(a) factors. Id.  It is

---

[5]  See Application Note, Background: Subsection (a) reflects the directive to the Commission, contained in Section 280003 of the Violent Crime Control and Law Enforcement Act of 1994, to provide an enhancement of *not less than three levels* for an offense when the finder of fact at trial determines beyond a reasonable doubt that the defendant had a hate crime motivation.

critically important for this Court to impose a sentence that sends a clear message that this conduct will not be tolerated in our communities as a deterrent to other like-minded individuals.

While the thrust of the Government's argument for an upward variance is based the unusual attributes of the offense of conviction as applied to the mandate of 3553(a) factors, the circumstances also warrant a traditional upward departure pursuant to Sentencing Guideline principles.  A USSG departure is permitted if the court finds "an aggravating... circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines." USSG 5K2.0 (quoting 18 U.S.C. 3553(b)).  The nature of this offense, and the extent of the damage caused by the Defendant support an upward departure to the GSR.  See United States v. Marsh, 561 F.3d 81 (1st Cir. 2009) (court of appeals upheld the district court reliance on 5K2.0(a)(1)(A) in departing upward based on "aggravating... circumstances of a kind, or to a degree, not adequately taken into consideration" by the GSR); United States v. Erpenbeck , 532 F.3d 423 (6th Cir. 2008) (court of appeals upheld district court's 5K2.5 upward departure since offense conduct caused property damage and loss not adequately taken into consideration by the GSR; United States v. Hardy, 99 F.3d 1242 (1st Cir. 1996) (appeals court found sentencing court's departure of 300% based on defendant's criminal history and offense conduct to be reasonable).

VII.    Government's Response to the Defendant's Sentencing Recommendation

    A.    Legal Challenges

The Defendant has challenged  the legality of the consecutive term of punishment prescribed by his conviction for 18 United States Code, Section 844(h) (Count Three) as well as the applicability of the three-level  enhancement pursuant to USSG § 3A1.1 .

1.    <u>Applicability of 18 U.S. C. § 844(h)(1)  Consecutive Sentences</u>

Legal authority clearly holds that the consecutive term of imprisonment mandated by 18 U.S.C. §844(h)(1) is not limited to underlying cases involving explosives, but also covers the use of fire while committing a federal felony.  <u>United States v. Severns</u>, 559 F.3d 274, 283-84 (5th Cir. 2009);  <u>United States v. Patel</u>, 370 F.3d 108, 115 (1st Cir. 2006).

2.    <u>USSG § 3A1.1(a) - Hate Crime Motivation or Vulnerable Victim</u>

Although the Defendant contests this enhancement, the guidelines expressly require the application of this enhancement to crimes sentenced under USSG § 2H.1.  Section 2H1.1, the basis for the Defendant's guideline analysis for his conviction on Counts One and Two, provides the starting point for calculating the offense level for all crimes involving individual rights, it is not limited to crimes motivated by hate.  Application Note 4 for Section 2H1.1 states that if  "the finder of fact at trial, or in the case of a plea of guilty or nolo contendere, the court at sentencing determines beyond a reasonable doubt that the defendant intentionally selected any victim or property as the object of the offense because of the actual or perceived race, color, religion... an additional 3-level enhancement from 3A1.1(a) *will apply*." (Emphasis added).

Section 3A1.1(a) of the Sentencing Guidelines provides that "[I]f the finder of fact at trial... determines beyond a reasonable doubt that the defendant intentionally selected any victim or any property as the object of the offense of conviction because of the actual or perceived race... of any person, increase by 3 levels." USSG § 3A1.1(a).   The Defendant's conviction for 18 U.S.C. § 247 requires the application of USSG § 31.1(a)  since a conviction for this offense conclusively establishes the jury found beyond a reasonable doubt that the Defendant chose to burn the

Macedonia Church because of the race of its members.[6]

      B.    <u>Defendant's Request for Downward Departure</u>

The Defendant's arguments that his exceptional circumstances support a downward departure or deviation from the GSR lack merit. The Defendant's proposed sentence of 120 months and one day, a single day more than the bare minimum sentence prescribed for his crime, falls far short of a just sentence for his crimes when examining his characteristics and in light of his offense conduct.

In considering the Defendant's characteristics, it is obvious he is utterly devoid of remorse. Instead, the Defendant, most recently through his sentencing submissions, attempts to reinvent himself as a law-abiding citizen, incapable of criminal conduct and hatred toward minorities. This Court should not credit the Defendant's proffered reasons for a downward variance or departure in light of the compelling evidence at trial, including testimony from his close acquaintances as well as his own words to the undercover trooper, that contradict his self serving self-portrait. The evidence of his animosity towards minorities was presented through the people closest to him, his friends and a former girlfriend, and included truly vile examples of language and conduct. This true identity of the Defendant is at great odds from that now painted by his sentencing submissions. For instance, while the Defendant now claims he was attempting to stop his father from assaulting his step-sister during the 2004 incident (as described in PSR § 37), this account is wholly inconsistent with the account of the incident as taken by the

---

[6] The Defendant's conviction for 18 U.S.C. 247(c) required the jury find beyond a reasonable doubt that (1) the Defendant defaced, damaged, or destroyed the property of the Macedonia Church of God in Christ, or attempted to do so; (2) the Defendant acted intentionally; and (3) the Defendant acted because of the race, color, or ethnic characteristics of the members of the Macedonia Church of God in Christ.

responding officer, as well as the resulting restraining order obtained by Ms. Pope *against* the

Defendant.  More generally, the Defendant's preposterous claim of peacemaker is further

contradicted by the witnesses who testified they observed the Defendant hurling racial epithets at

minorities and encouraging brawls on two separate occasions.[7]

       Contrary to his claims concerning his law-abiding nature, the Defendant's conduct during

his encounter with the undercover agent revealed the Defendant was ready, willing, and capable

of burning a commercial building in Holyoke.[8]  The recording of this meeting captured the

Defendant, upon entering the vehicle,  immediately steer the conversation to the previously

discussed (with Benjamin Haskell) arson job in Holyoke.[9]  Throughout this encounter with the

undercover trooper, the Defendant plotted in a calm and deliberate manner to destroy a building

in Holyoke as well as a house in Springfield for payment.  The Defendant displayed his

knowledge, experience, and skills by discussing various means to commit arson,  such as the use

of homemade napalm, as well as taking advantage of the building's natural gas supply as a means

to blow it to pieces.[10]  The Defendant's criminal intent and proclivities were most convincingly on

display during the private conversation he shared with his best friend, co-defendant Benjamin

---

[7]See testimony of Joshua Barr (Tr. April 6 at 16-17 ); and Edwin Gonzalez-Ramirez (Tr. April 6 at 16-17 ) "I remember Mikey Jacques being like "fuck you, you fucking nigger," and the next thing you know it's pretty much 20 on 20.  There's kids on both sides ready to fight." See also the testimony of Anthony Mazza, who described the Defendant's participation in a racially-motivated fight while leaving the "Big E" Fairgrounds. (Id. at 78-79)

[8]See attached Government Trial Exhibit 19, introduced into evidence on March 23, 2011. The actual recording, Exhibit 18, was also introduced and admitted to the jury.

[9] "So where is this place?" the Defendant asked upon entering the vehicle.  Id. 19 at 18

[10] Id. 44-46.

Haskell.[11]  During this conversation, Defendant was at ease discussing the proposed arson of the

building in Holyoke they had just viewed, as evidenced by the following exchange with Haskell:

| | |
|---|---|
| Jacques: | Really it doesn't even need to be two people, if you ask me. I can do it myself, but yeah, two people is better. |
| Haskell: | All right. |
| Jacques: | We can cover more ground. |
| Haskell: | As long as your cool with that. |
| Jacques: | Oh yeah, I'm definitely cool with that. |
| Haskell: | All right. |
| Jacques: | Yeah, I mean it, it's close to other places but it's vacant and I mean napalm, dude, you now how napalm works. |
| Haskell: | I know. |
| Jacques: | I'll make a shitload. |
| Haskell: | He [UC] wants this place to go down just like the church went down, man. |
| Jacques: | Of course. |
| Haskell: | Fucking nothing but a statue. |
| Jacques: | Of course.  Just a brick fucking frame.[12] |

During this conversation, the Defendant had no reason to believe he was being recorded,

no reason to lie to his best friend Haskell.  The only concern expressed by the Defendant during

this conversation was his being paid for the jobs.[13]  The Defendant's true identity, as revealed by

---

[11]Id. 54-60.

[12]Id. 55-56

[13]  Id. 57-58.

his words and actions, as well as the words of people close to him, is incompatible to the self-image the Defendant now offers to this Court.

On this day of reckoning, the Defendant seeks to essentially to wipe the slate clean without any acceptance of responsibility or remorse for his actions and beliefs, in an attempt to seek mercy from this Court. It is clear the Defendant has retreated to, and has invited the Court to follow, a world where he's still "Mikey" a withdrawn, misunderstood - though innocent - young man, who suffered at the hand of a tyrant of a father, and who now deserves leniency.

The Defendant also relies on his difficult childhood and substance abuse in seeking a downward departure from the GSR. Even accepting the Defendant's version of his difficult upbringing, the abuse alleged does little to either explain or diminish the consequences of his crime. He submits no evidence that suggests this upbringing correlates to his racism and interest in committing arson.

Finally, the Defendant once again offers his dependency of oxycodone to explain his confession and as a basis for leniency. The claim is no more compelling now than when offered by Defendant during the pretrial hearings as an explanation for his confession. The evidence of Jacques's mental awareness during the relevant time periods for the crime and his confession clearly established that he acted intentionally and deliberately. Evidence that Defendant acted without impairment included a recorded telephone call from Haskell to Defendant,[14] the recorded

---

[14]The telephone call (Government Exhibits 77 (recording) and 78 (transcript), occurred on January 15, 2008, preceding the meeting in the undercover trooper's vehicle. The call revealed Defendant to be alert, responsive, and his displayed no signs of impairment. Defendant asks Haskell about criminal conduct before advising Haskell not to say more on the recorded line. Defendant agreed to meet Haskell later in order to discuss meeting with "Jose, " [the undercover trooper].

meeting that occurred in the undercover trooper's vehicle,[15] the recordings of Defendant

Jacques's admission, and finally,  Hampden County Sheriff Department Nurse Meredith Passa's

testimony that Defendant did not display any signs of withdrawal when he entered the jail on

January 15, 2009.[16]  Neither his purported arrested development nor his alleged use of opiates,

provide the basis for downward departure or variance.

VIII.    <u>Conclusion</u>

      The Unites States respectfully requests this Court impose its recommended sentence.

Imposing a sentence of 192 months would provide just punishment commensurate with the

serious nature of the offense, promote respect for equal rights of our citizenry, and provide

adequate deterrence.


              Respectfully submitted,

              CARMEN M. ORTIZ
              United States Attorney

By:    <u>/s/ Paul Hart Smyth          </u>
        Paul Hart Smyth
        Assistant U.S. Attorney

        <u>/s/ Kevin O'Regan          </u>
        Kevin O'Regan
        Assistant U.S. Attorney

        <u>/s/ Nicole Lee Ndumele        </u>
        Nicole Lee Ndumele
        Trial Attorney
        DOJ Civil Rights Division

Date:   December 21 , 2011

--------

[15]See infra. Ex. 19.

[16]Tr. April 6 at 134 to 140.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that these documents filed through the ECF system will be sent electronically to

the registered participants as identified on the Notice of Electronic Filing (NEF).

/s/ Paul Hart Smyth

_____

Paul Hart Smyth
Assistant United States Attorney

Date: December 21, 2011